**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-8996
_____

D. C. Docket No. 1:95-CV-1165-CC

RALPH W. ENSLEY,

                              Plaintiff-Counter-Defendant-Appellee,

C. WESLEY ENSLEY,

                                        Plaintiff-Appellee,

                    versus

LARRY SOPER, Sergeant,

                                              Defendant,

MIKE JOHNSTON, Officer,

                                        Defendant-Appellant,

JAMES GILLELAND, Officer of the City of Canton, Georgia Police
Department, in their official and individual capacities,

                                              Defendant,

DANNY DOYLE,

                                        Counter-Claimant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
**(June 11, 1998)**

Before TJOFLAT, BIRCH and MARCUS[*], Circuit Judges.

BIRCH, Circuit Judge:

In this interlocutory appeal, we determine whether the defendant police officer, Mike Johnston, is entitled to qualified immunity regarding claims that he failed to (1) warn the plaintiffs that they were entering a crime scene and (2) intervene when his fellow officers used excessive force against the plaintiffs. In denying summary judgment to Johnston, the district court stated only that a reasonable juror could conclude from the evidence that his fellow officers had used excessive force. Johnston argues that, even assuming the plaintiffs' allegations are true, he did not have a clearly established duty to warn or assist them. We reverse.

## I. BACKGROUND

For the purposes of this appeal, we view the facts in the light most favorable to the non-moving parties, plaintiffs Ralph and

---

[*]Honorable Stanley Marcus, U.S. District Judge of the Southern District of Florida, sitting by designation as a member of this panel when this appeal was argued and taken under submission. On November 24, 1997, he took the oath of office as a United States Circuit Judge of the Eleventh Circuit.

Wesley Ensley.[1]  See Riley v. Newton, 94 F.3d 632, 634 (11th Cir. 1996), cert. denied, __ U.S. __, 117 S. Ct. 955, 136 L. Ed. 2d 842 (1997).

On the night of May 15, 1993, two undercover officers of the Cherokee County, Georgia police department conducted an undercover operation against a suspected drug dealer.  After luring their suspect to the parking lot of a convenience store just outside the city of Canton, Georgia, the two plain-clothes officers attempted to arrest him.  During the course of this arrest, the suspect's attempt to flee led both to a crash between his and the officers' cars and to the accidental and harmless discharge of one officer's firearm.  As a result of these events, a crowd of store customers and neighbors began to gather near the crime scene, and an additional six Cherokee County officers, two City of Canton officers, and a Georgia State Trooper soon arrived at the scene.  Of the total of eleven

---

[1] Like the parties, we refer to the Ensley brothers as "Ralph" and "Wesley" for convenience and clarity.

officers at the parking lot following the arrest, six wore police uniforms; five marked police cars were also present.

One of the Canton officers who came to the parking lot was Johnston, who was in uniform. Soon after Johnston's arrival at the lot, firecrackers apparently went off in the vicinity of a neighboring furniture store. After hearing these noises, Johnston returned to his marked patrol car and drove to the furniture store's parking area to investigate. Unbeknownst to Johnston at that time, the furniture store was owned by Ralph; in fact, Ralph owned both the furniture store to the left of the convenience store and the video store to the right of the convenience store. At the time of the drug arrest, Ralph and his brother were in the furniture store, while Ralph's wife was in the video store. Apparently, both Ralph and Wesley had recently been engaged in the consumption of alcohol. When Ralph received a telephone call from a neighbor suggesting that a robbery was taking place in his video store (with his wife as a presumed victim),

Ralph picked up an iron bar and exited the furniture store with Wesley.

Upon his arrival at the furniture store, Johnston encountered Ralph and Wesley and asked them whether they had heard firecrackers. Although the substance of the Ensleys' response is in dispute, Ralph asserts that he told Johnston that he had heard gunshots, that he believed a robbery was in progress at his nearby video store, and that they needed Johnston's assistance. Ralph and Wesley then ran across the parking lot toward the convenience and video stores. The Ensleys maintain that Johnston did not warn them that there were police officers or a crime scene in the convenience store lot, but they do not claim that Johnston gave them any affirmative assurance that he would assist them; the Ensleys apparently assumed that Johnston was following them to help foil the supposed robbery.

As the Ensleys ran across the parking lot, Johnston drove his patrol car back to the convenience store lot. At that time, the lot was

apparently unlit. According to Ralph, none of the officers in the lot made any attempt to identify themselves or to warn him of any danger as he approached the convenience store. Ralph and Wesley, however, concede that, as they neared the crime scene, they saw that a man had been handcuffed and was sitting by a wall outside the convenience store. Ralph and Wesley also apparently concede that they did not attempt to ascertain from any of the various people present whether a robbery was in fact occurring or their assistance was in any way required.

Upon entering the crime scene, Ralph soon became involved in an altercation with a plain-clothes officer, Danny Doyle. Although Doyle was wearing a badge and other police accouterments (such as handcuffs at his waist), Ralph contends that he did not realize that the man who was restraining him was a law enforcement officer. When Ralph subsequently resisted Doyle's attempt to arrest him, several other officers at the scene, including at least one uniformed officer, joined in handcuffing and "hog-tying" Ralph. During the

course of this arrest, Ralph hit Doyle with the iron bar (albeit allegedly unintentionally), lacerating Doyle's head and chipping his tooth. During and shortly after this arrest, several of the officers allegedly kicked and beat Ralph. As all of the parties agree, Johnston did not participate in any way in Ralph's arrest or in any subsequent alleged abuse.

While several officers subdued Ralph, Johnston and two other officers were busy arresting Wesley. As Wesley concedes, he attempted to come to Ralph's assistance when Ralph became entangled with Doyle. When Wesley grabbed Doyle's metal flashlight, Deputy Diane Bagget, soon joined by another officer and Johnston, restrained and arrested Wesley. Johnston then placed Wesley in Johnston's patrol car.

Although the Cherokee officers charged Ralph and Wesley with several crimes, a jury acquitted both Ensleys of all charges stemming from the incident. On May 5, 1995, the Ensleys then sued several of the Cherokee County and Canton officers in their official

7

and individual capacities for, <u>inter alia</u>, false arrest and use of excessive force (<u>i.e.</u>, assault and battery), in violation of their rights under the Fourth and Fourteenth Amendments (enforced through 42 U.S.C. § 1983).[2] On May 7, 1995, the Cherokee defendants moved for summary judgment, as did Johnston and a fellow Canton officer on May 9, 1996. On May 31, 1996, the Ensleys dismissed two defendants in both their official and individual capacities and Johnston in his official capacity only.

On July 31, 1996, the district court granted in part and denied in part the various motions for summary judgment. In its order, the district court ruled that, even viewing the evidence in the light most favorable to the Ensleys, the officers had probable cause to arrest Ralph and Wesley and, therefore, the officers were entitled to qualified immunity for the false arrest claims. The district court, however, denied Johnston's motion for summary judgment on

---

[2]The Ensleys also brought their suit alternatively as a state cause of action. The nature of and basis for the Ensleys' alternate state law claims are unclear from the record.

Ensley's excessive force claim. In explanation, the court stated only that:

> A police officer's use of force must be examined in light of the facts of each individual case. Popham v. Kennesaw, 820 F.2d 1570, 1576 (11th Cir. 1987). Resolving the disputed factual issues in plaintiffs' favor, a reasonable person could conclude that defendants used excessive force. Therefore, Officer Johnston is not entitled qualified immunity on plaintiffs' claims of excessive force.

R9-69 at 12-13. Following the court's order, Johnston filed this interlocutory appeal.

## II. DISCUSSION

On appeal, Johnston renews his contention that he is entitled to qualified immunity.[3] The doctrine of qualified immunity "protects government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable

---

[3]This court has jurisdiction to hear Johnston's interlocutory appeal because the district court's denial of qualified immunity to Johnston rests on a disputed issue of law or of mixed law and fact. See, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1484-85 (11th Cir. 1996).

person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotation marks omitted). Any case law that a plaintiff relies upon to show that a government official has violated a clearly established right must pre-date the officer's alleged improper conduct, involve materially similar facts, and "truly compel" the conclusion that the plaintiff had a right under federal law. See id. at 1150. Moreover, "[o]bjective legal reasonableness is the touchstone"; a court must examine whether a government officer has acted in an objectively reasonable fashion under the circumstances, without any consideration of the government actor's subjective intent. Id.

The Ensleys contend that Johnston violated two of their clearly established rights. First, they maintain that Johnston trammeled upon their right to be warned that they were about to enter a dangerous crime scene. Second, they argue that Johnston violated Ralph's right to expect Johnston's intervention when Ralph suffered from police brutality in Johnston's presence. We review the district

court's denial of a defendant's motion for summary judgment on the basis of qualified immunity <u>de novo</u>.  <u>See</u> <u>Dohilite v. Maughon by and through Videon</u>, 74 F.3d 1027, 1040 (11th Cir. 1996).

## A. DUTY TO WARN

The federal Constitution does not oblige any state or local government to ensure the safety of its citizens.  <u>See, e.g.</u>, <u>DeShaney v. Wennebago County Dept. Soc. Serv.</u>, 489 U.S. 189, 194-203, 109 S. Ct. 998, 1002-07, 103 L. Ed. 2d 249 (1989).  Moreover, a police officer does not have any duty under federal law to warn or protect any particular member of the public unless either (1) a "special relationship" exists between the victim and the criminal or between the victim and the state or (2) the victim faces a special danger not applicable to the public at large.  <u>See, e.g.</u>, <u>Jones v. Phyfer</u>, 761 F.2d 642, 647 (11th Cir. 1985) (holding that police did not have duty to warn woman that her attacker was on furlough); <u>Wright v. City of Ozark</u>, 715 F.2d 1513, 1515 (11th Cir. 1983) (holding that police did

11

not have duty to divulge wave of rapes).[4]  In this case, the Ensleys

have not alleged that they had a special relationship with Johnston

before he purportedly failed to warn them that they were running

toward a crime scene; Johnston had not, for example, affirmatively

assured them that he would protect or assist them in their rush to the

video store.[5]  Nor have the Ensleys alleged that they faced a special

danger.  As a matter of law, therefore, Johnston could not have

_____

[4]The Ensleys attempt to sidestep these cases by arguing that Johnston had a duty to warn them under a provision of the City of Canton Police Department Operations Manual stating that "Officer at the scene contains situation by establishing perimeter security." R8-62 Exh. W at 18-5.  Without some further regulation or case law establishing what procedures Johnston should have followed in order to have maintained perimeter security, however, this bare statement in the Manual is insufficient to establish clearly any duty for Johnston to warn the Ensleys.  Cf. Lassiter, 28 F.3d at 1151-52.  Further, even if the Manual were more specific, the Ensleys cannot base a § 1983 claim solely on an alleged violation of non-federal law.  See Jones, 761 F.2d at 647.

[5]In fact, the only case law that the Ensleys cite involving a government officer and a duty to warn or protect is  Landis v. Rockdale County, 212 Ga. App. 700, 445 S.E. 2d 264 (Ga. Ct. App. 1994) (holding that a "special relationship" is a prerequisite for an officer to have a duty to protect under Georgia law).  As we have preciously explained, only U.S. Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the state from which a case arose may "clearly establish" rights under federal law for this circuit.  See Jenkins v. Talledega City Bd. of Educ., 115 F.3d 821, 827 n.4 (11th Cir.) (en banc), cert. denied, __ U.S. __, 118 S. Ct. 412, 139 L. Ed. 2d 315 (1997).  Landis, however, is a decision of the Georgia Court of Appeals and deals only with state law.  "[A] Section 1983 claim may not be based simply on the allegation that governmental officials violated state law in failing to take protective measures."  Jones, 761 F.2d at 647 (internal quotation marks omitted).

violated any right of the Ensleys to a warning. Thus, Johnston is entitled to qualified immunity and, therefore, to summary judgment on the Ensley's failure to warn claim brought under § 1983.[6]

## B. DUTY TO INTERVENE

The Ensleys also argue that Johnston had a duty to intervene when his fellow officers allegedly used excessive force against Ralph. As Johnston concedes, it is clear that "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986). The Ensleys, however, can point to no case recognizing such a duty on materially

---

[6]Because this appeal involves only Johnston's potential qualified immunity from the Ensleys' § 1983 claims, we do not express any opinion on the viability of the Ensleys' state law claims for Johnston's alleged failure to warn (or to intervene). The district court may decide on remand whether it wishes to exercise pendant jurisdiction over the Enselys' remaining state law claims against Johnston. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349-50, 108 S. Ct. 614, 619, 98 L. Ed. 2d 720 (1988) (holding that exercise of pendant jurisdiction is at discretion of district court).

similar facts to those underlying this case. Unlike Byrd, this is not a case in which an officer is alleged to have stood idly by while a fellow officer mistreated a member of the public. Rather, all of the abuse allegedly suffered by Ralph occurred while Johnston was attempting to restrain and arrest Wesley. Without some precedent holding that an officer has a duty to abandon his attempt to arrest one armed attacker in order to protect another armed attacker against whom other officers may be using excessive force, Johnston had discretion to decide whether Wesley or the officers arresting Ralph deserved his immediate attention. See Riley, 94 F.3d at 635 (holding that an officer who was engaged in arresting a suspect, and who did not observe his fellow officer's use of excessive force on a second suspect, did not have a duty to intervene).

Further, in order for an officer to be liable for failing to stop police brutality, the officer must be "in a position to intervene." Id.; see also Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir. 1994). At oral argument, we requested that the Ensleys provide us with a

supplemental brief listing all of the evidence in the record that might lead a reasonable juror to believe that Johnston had an opportunity to observe or halt any excessive force directed at Ralph. After thoroughly examining the Ensleys' submission, we see no evidence in the record that might show that Johnston observed his fellow officers' alleged abuse of Ralph or that he had opportunity to intervene. As all the parties agree, Johnston and the two other officers who together arrested Wesley observed the initial altercation between Ralph and officer Doyle.[7] Once Wesley joined the fray, however, Johnston became actively involved in the arrest of Wesley; Johnston therefore claims that he did not observe any use of excessive force against Ralph. In fact, even Wesley concedes that he did not see any abuse, see R8-62 Exh. L at 20; since Johnston was with Wesley, Wesley's testimony corroborates Johnston's claim that he was not in a position to know Ralph's circumstances. Against this evidence, the Ensleys offer nothing that might show that

---

[7]The Ensleys do not dispute before this court that Doyle had probable cause to arrest Ralph.

15

Johnston could have or did observe excessive force. Finally, Johnston had little choice but to remain with Wesley while he and his fellow officers brought Wesley under control and secured him in Johnston's vehicle. Under these circumstances, we believe that no reasonable juror could find that Johnston was "in a position to intervene." Therefore, even if the district court is correct that "a reasonable person could conclude that . . . [Johnston's fellow officers] used excessive force," we see no evidence that might lead a reasonable juror to conclude that Johnston violated any clearly established right of Ralph to intervention. Again, Johnston is entitled to qualified immunity and thus summary judgment on the Ensleys' claim regarding Johnston's alleged failure to intervene.

## III. CONCLUSION

Johnston appeals the district court's order denying him qualified immunity. Because Johnston did not have any clearly established duty to warn the Ensleys before they entered the crime scene, and

because Johnston did not have a clearly established duty to abandon his attempt to arrest Wesley in order to assist Ralph, we hold that the district court was in error. Therefore, we REVERSE and REMAND the case to the district court for further proceedings consistent with this opinion.